IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MATTHEW SCHAEFER and<br>CYNTHIA SCHAEFER,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNIVERSAL SCAFFOLDING &<br>EQUIPMENT, LLC, DYNEGY MIDWEST<br>GENERATION, LLC and BRAND ENERGY<br>SERVICES, LLC,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 3:10-cv-00791-PMF<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM AND ORDER**

**FRAZIER, Magistrate Judge:**

    Before the Court is Dynegy Midwest Generation, LLC's ("Dynegy") Motion For Summary Judgment on Count IV for Construction Negligence (Doc. 190). Plaintiff Matthew Schaefer filed a response in opposition (Doc. 197) and Dynegy filed a response thereto (Doc. 198). In November 2008 plaintiff Matthew Schaefer, a carpenter employed by defendant Brand Energy Services, LLC, ("Brand") was injured while erecting scaffolding at Dynegy's Baldwin Power Plant in Baldwin, Illinois. According to the second amended complaint, a piece of scaffolding separated from the scaffolding structure and fell on the plaintiff. Plaintiff alleges that the scaffolding that fell on him was manufactured by defendant Universal Scaffolding & Equipment, LLC ("Universal"). Complicating matters is the fact that the piece of scaffolding that fell on the plaintiff was lost sometime in 2010 or 2011.

    Because the scaffolding in question can no longer be found, the plaintiffs' negligence claim (Count I), product liability claim (Count II), failure to warn claim (Count III), and loss of consortium claim (Count VII) against Universal were disposed of by summary judgment in

1

Judge Reagan's February 10, 2014 Order (Doc. 159). Judge Reagan's order also bifurcated Dynegy's contribution claim against Universal, pending the outcome of the other claims. The following counts remain:

>  **Count IV:** Matthew Schaefer negligence claim against Dynegy
>
>  **Count V:** Matthew and Cynthia Schaefer negligent spoliation claim against Dynegy
>
>  **Count VI:** Matthew and Cynthia Schaefer negligent spoliation claim against Brand
>
>  **Count VII:** Cynthia Schaefer loss of consortium claim against Dynegy and Brand.

Dynegy also asserts two crossclaims:

>  **Count I:** Dynegy contribution claim against Brand
>
>  **Count II:** Dynegy contribution claim against Universal **(bifurcated)**.

Dynegy now seeks summary judgment on Count IV, plaintiff Matthew Schaefer's negligence claim. For the following reasons, Dynegy's motion for summary judgment is GRANTED.

## I.   BACKGROUND

Defendant Brand is in the business of installing industrial scaffolding. Defendant Dynegy operates a coal power plant in Baldwin, Illinois. In April 2008 Brand and Dynegy entered into an agreement (the Master Service Agreement, or "MSA") which set forth the conditions upon which Brand would provide scaffolding related services at the Baldwin plant. At the Baldwin site, Brand installed "cup lock" system scaffolding. Cup lock scaffolding is a system where the scaffold bars have tabs on them, and a "cup" or "ring" slips over the tabs to lock the scaffold together. Cup lock scaffolding was the type of scaffolding Schaefer worked on when he was injured. The scaffolding was needed because Dynegy was installing a dry flue-gas desulfurization or "scrubber" system at the Baldwin plant.

Relevant provisions of the MSA include Section A.23 of the MSA, "RELATIONSHIP OF THE PARTIES" which states:

"Contractor is, and shall continue to be, an independent contractor, and any provisions of this Agreement or any Purchase Order which may appear to give Dynegy the right to direct Contractor as to details of performing any Services, or to exercise a measure of control over Contractor's performance of the Services, shall be interpreted to mean that Contractor will follow the instructions of Dynegy with respect to the results of the Services achieved only and not in the means whereby the Services are to be accomplished, Contractor shall have complete and authoritative control as to the details performing the Services."

Despite the "independent contractor" provision, the MSA did have a number of provisions that allowed Dynegy to exhibit some degree of participation concerning Brand's services. Such provisions include:

"A.2 CONTRACTOR'S GENERAL OBLIGATIONS… If at any time, Contractor (Brand) fails to perform the Services in the manner set forth in this Agreement or at the specific times as may be subsequently agreed to, then Contractor shall, immediately upon the request of Dynegy, at no additional cost to Dynegy, take all necessary steps, including but not limited to, the replacement of defective equipment, the provision of additional equipment and/or labor, the institution of changes in method and manner of performance, and other measures as required so to perform… Contractor shall provide Dynegy the right to inspect, at any time, Contractor's operations and facilities including but not limited to tools, equipment, Materials, Services and inventory thereof."

"A.3 CONTRACTOR'S EMPLOYEES AND SUBCONTRACTORS… If, in Dynegy's sole judgment it is desirable, Contractor, at Dynegy's request, shall remove any Contractor employee or Subcontractor performing the Services or at the Site."

"A.5 SAFETY REQUIREMENTS... During the term of this Agreement, Contractor shall fully comply with the safety and security policies and procedures of Dynegy Including, but not limited to, the Minimum Contractor Safety Requirements attached to this Agreement as Exhibit "E"."

The "Minimum Contractor Safety Requirements" lists six pages of obligations that Brand was required to follow. One provision states that "Dynegy reserves the right to inspect and deny access or use of any equipment or substance brought on site." Other obligations included reporting mandates of any workplace injuries, the establishment of a site safety representative to "enforce Dynegy and Contractor safety requirements," a prohibition on alcohol and drugs from the worksite, a provision allowing Dynegy to conduct searches and drug and alcohol screenings, personal protective gear requirements, a requirement that Brand conduct safety meetings, a requirement that hazards and unsafe conditions be reported to Dynegy, along with other safety mandates.

Don Watson was Dynegy's Director of Safety and Health at the Baldwin plant. At his deposition, Watson stated that he was frequently at the site, he would perform inspections of the job site, and if he found any safety issues he would try to have them corrected. Watson also stated that he did not remember any problems with respect to defective scaffolding (prior to the Schaefer incident). Although Watson did not recall any specific problems with the scaffolding, he did remember ordering Brand to correct two safety issues he observed at the site. In one instance he noticed that there was an unsafe gap in some of the scaffolding floor boards. In

another instance there were some scaffolding components that were positioned at a low height, thereby creating a risk that a worker may hit their head. In both instances Watson notified Ryan Wampler, and the issues were corrected.

Ryan Wampler served as Brand's site superintendent when Schaefer's injury occurred. He was also Brand's site safety person. At Wampler's deposition, he stated that Brand workers were encountering problems with the scaffolding prior to Schaefer's injury. Early in the project, Wampler became aware that scaffolding lengths were not uniform and that there were "twisted ears." When Wampler realized that some of the scaffolding was bad, he had his workers examine the new pallets of scaffolding for defects. If a piece of scaffolding was defective, Wampler directed that the piece be spray painted orange and placed in a "junk stack" at the Baldwin site. Sometime later the defective pieces were shipped back to Brand's office in Fenton, Missouri. In total, Wampler recalled that there were approximately three or four pallets of defective scaffolding. Furthermore, Wampler stated that some of the cups were loose on the erected scaffolding. In response, Wampler directed the carpenters to hammer the cups so that they would be more secure. Wampler stated at his deposition that he discussed the scaffolding problems with Watson prior to Schaefer's injury. Watson however, stated in his deposition that he never recalled such a conversation taking place.

Maynard Hudson, Jr. was another Brand employee erecting scaffolding at the Baldwin site. According to Hudson, he was working above Schafer when Schaefer's injury occurred. The details surrounding Schaefer's injury are not entirely clear; Hudson stated at his deposition that immediately before Schaefer's injury, Hudson was installing a horizontal scaffolding bar. As Hudson positioned the horizontal scaffolding bar into place, another scaffolding bar popped out

5

of place. The loose scaffolding bar then fell out of the scaffolding structure and Hudson observed the piece of scaffolding strike Schaefer in the head.

Plaintiff Matthew Schaefer testified at his deposition that he was a journeyman carpenter working for Brand at the Baldwin plant. Schaefer also recalled that there were issues with the scaffolding, and stated that a day or two prior to his injury, there was a piece of scaffolding that was working itself loose. Furthermore, on the day of the accident Schaefer observed another Brand employee, Chuck Aaron, spray painting pieces of scaffolding at the site. When he questioned Aaron as to why he was doing that, Aaron stated that some of the ears on the scaffolding were twisted and he was spraying them to designate that they are to be removed from the site.

## II.    ANALYSIS

Summary judgment will be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The facts and all reasonable inferences are drawn in favor of the nonmoving party. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012). A genuine dispute as to a material fact exists if "a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). When presented with a motion for summary judgment, "the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994).

To establish a negligence claim the plaintiff must demonstrate "the existence of a duty, a breach of the duty, and an injury to the plaintiff that was proximately caused by the breach."

*Vancura v. Katris*, 238 Ill. 2d 352, 373, 939 N.E.2d 328, 342 (2010). Dynegy argues that because it lacked sufficient control over Brand, it did not owe a duty to Schaefer. Dynegy's position is consistent with the general rule regarding independent contractors; that a party who hires an independent contractor is not liable for the acts or omissions of the independent contractor . *Gomien v. Wear-Ever Aluminum, Inc.*, 50 Ill. 2d 19, 21, 276 N.E.2d 336, 338 (1971). But the general rule is not without exceptions, and Schaefer argues three theories of recovery; 1) the retained control exception to the independent contractor rule, Restatement (Second) of Torts (hereinafter "Restatement") § 414 (1965), 2) premises liability, Restatement §§ 343 and 343a, and 3) failure to warn, Restatement § 388.

### A. Retained Control – Section 414 of the Restatement (Second) of Torts

Illinois Courts have adopted the retained control exception as set forth in Section 414 of the Restatement. *Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, 211 N.E.2d 247 (1965). Section 414 states:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

Whether the employer retained sufficient control over the independent contractor to establish liability under Section 414 is a question of fact. *Grillo v. Yeager Const.*, 387 Ill. App. 3d 577, 594, 900 N.E.2d 1249, 1266 (2008). "Only when the evidence presented is insufficient to create a factual question can the issue be decided as a matter of law." *Id*.

As the type of control over the independent contractor may vary from contract to contract and jobsite to jobsite, Courts have construed Section 414 of the Restatement and its comments to set forth a "continuum" of control. *Martens v. MCL Const. Corp.*, 347 Ill. App. 3d 303, 314, 807 N.E.2d 480, 488 (2004). At one end of the continuum is a relationship where "the employer of an independent contractor retains control over the operative detail of doing any part of the work." Restatement Section 414, Comment *a*. In such a situation the employer of the independent contractor is liable for the torts of the independent contractor based on a master servant relationship as found in the *Restatement of Agency*. *Aguirre v. Turner Const. Co.*, 501 F.3d 825, 829 (7th Cir. 2007), *Contra*, *Lee v. Six Flags Theme Parks, Inc.*, 2014 IL App (1st), 381 Ill.Dec. 359, 10 N.E.3d 444 (2014).[1] In the middle of the continuum is the Restatement § 414 retained control situation. Comment *b* to Restatement § 414 provides guidance as to when the "retained control" exception applies:

> "The rule stated in this Section is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the

---

[1] As the Court in *Aguirre* recognizes, there is a good deal of confusion, and somewhat of a split between the Seventh Circuit and the intermediate Illinois appellate courts as to whether Section 414 creates a cause of action for vicarious liability and direct liability, or direct liability alone. *Aguirre*, 501 F.3d at 828. In *Aguirre* the Seventh Circuit rejected the idea that Section 414 creates a cause of action for vicarious liability, noting:
> "Section 414 takes over where agency law ends by providing a theory of direct liability based on the existence of a duty of reasonable care. That duty is triggered when the employer—usually a general contractor—has retained supervisory control over the independent contractor without retaining control over all operative details of a project."

*Aguirre* was appealed to the Seventh Circuit, remanded and appealed once more. On its second appeal, the Court went on to discuss Section 414:
> "Some cases discuss this rule under the rubric of "retained control," but that rather begs the question: control of what? Better to say that if the general contractor's contract with the subcontractor, or a law, requires him to take care for the safety of the subcontractor's work, he has a duty of care enforceable by tort law. A general contractor who fails to fulfill that duty is liable if injury results—not derivatively liable, as under respondeat superior, but liable for its own negligent act or omission." *Aguirre v. Turner Const. Co.*, 582 F.3d 808, 810 (7th Cir. 2009).

work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself. So too, he is subject to liability if he knows or should know that the subcontractors have carelessly done their work in such a way as to create a dangerous condition, and fails to exercise reasonable care either to remedy it himself or by the exercise of his control cause the subcontractor to do so."

To fall under Section 414, "it is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations" but the employer must have a level of control so that "the contractor is not entirely free to do the work in his own way." Restatement Section 414, Comment *c*. Finally, at the other end of the continuum is the situation where the employer has little control over the independent contractor. As previously stated, in such situations the employer is generally not liable for the acts or omissions of the independent contractor.

Here, Dynegy did not retain sufficient control over the work of Brand so as establish a duty under Section 414. When analyzing retained control situations, Illinois Courts consider whether the general contractor retained contractual control, supervisory control, operational control, or a mix thereof. *Lee v. Six Flags Theme Parks, Inc.*, 2014 IL App (1st), 381 Ill.Dec. 359, 379, 10 N.E.3d 444, 464 (2014). Under the MSA, the "Relationship of the Parties" provision demonstrates that Brand and Dynegy intended for there to be a general contractor – independent contractor relationship. Based on this language it appears that the Brand and Dynegy were specifically attempting to avoid the "retained control" situation described in

Section 414. Despite the "Relationship of the Parties" provision, Schaefer argues that other provisions of the MSA, including the "A.2 Contractor's General Obligations," the "A.3 Contractor's Employees and Subcontractors" and the MSA "A.5 Minimum Contractor Safety Requirements" provisions trigger a duty under Section 414. The Court disagrees. The "Contractor's General Obligations" provision merely *permits* Dynegy to direct Brand to correct any problems if Brand is in breach of the MSA. The Contractor's Employees and Subcontractors provision does allow Dynegy to remove Brand employees from the site, but this provision is much more similar to "starting and stopping work" than it is to controlling the details of a project so that a "contractor is not entirely free to do the work in his own way."

The safety provisions in the MSA also fail to trigger a duty under Section 414. A contractor may find such generalized safety obligations on any large construction site. The MSA also *permits* Dynegy to inspect and stop Brand's work, but the MSA does not create a duty for Dynegy to do so. Work place safety is a general concern that is easily distinguishable from exercising control over the manner or means of construction. Dynegy's interest in the safety program is to have a cost effective construction project with as little delay as possible. Nowhere in the MSA does it appear that Dynegy is obligated "to take care for the safety of the subcontractor's work." *Aguirre*, 582 F.3d at 810. Furthermore; creating liability in these types of situations would discourage general contractors from establishing site safety programs. As one Illinois appellate court noted; "Penalizing a general contractor's efforts to promote safety and coordinate a general safety program among various independent contractors at a large jobsite hardly serves to advance the goal of work site safety." *Martens v. MCL Const. Corp.*, 347 Ill. App. 3d 303, 318, 807 N.E.2d 480, 492 (2004).

This leaves the question of whether Don Watson's presence establishes "supervisory" or "operational" retained control so as to trigger liability under Section 414. Don Watson was Dynegy's Director of Safety and Health at the Baldwin plant, and he often visited the construction site. Also, on two occasions he directed Brand to fix safety issues; in one instance there was a gap in the scaffolding floorboards, and in another instance a scaffolding component was placed too low. Schaefer argues that these facts are analogous to those in *Bokodi v. Foster Wheeler Robbins, Inc.*, where the Court held a duty did exist under Section 414. 312 Ill. App. 3d 1051, 728 N.E.2d 726 (2000). What separates the present situation from *Bokodi* is that the defendants in *Bokodi* were constantly monitoring the construction site. Here, Don Watson's obligations extended to the entire Baldwin facility. Watson often visited the site, but he was not a constant presence as was the defendant was in *Bokodi*. Moreover, there is no indication that any Dynegy employees were present when the injury occurred. Also, Watson's directions to fix a gap in the floorboards and to raise a scaffolding component appear to be fall in the category of "alterations and deviations" as opposed to a situation where "the contractor is not entirely free to do the work in his own way." When the MSA and Don Watson's role are viewed as a whole, Dynegy did not exert sufficient control over Brand so as to establish a duty under Section 414.

B. Premises Liability - Sections 343 and 343a of the Restatement (Second) of Torts

Schaefer is also pursuing a negligence claim against Dynegy based on premises liability. Illinois Courts have adopted Sections 343 and 343a of the Restatement. *Ward v. K Mart Corp.*, 136 Ill. 2d 132, 149, 554 N.E.2d 223, 231 (1990). Sections 414 and 343 are not mutually exclusive and a plaintiff may pursue recovery under both theories of negligence. *Clifford v. Wharton Bus. Grp., L.L.C.*, 353 Ill. App. 3d 34, 41, 817 N.E.2d 1207, 1214 (2004). "The duty of

reasonable care imposed on a general contractor as the owner or possessor of the premises is independent of its duty to exercise reasonable care where it retains control of work entrusted to an independent contractor." *Id*. Section 343 of the Restatement states:

> "A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
>> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>>
>> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>>
>> (c) fails to exercise reasonable care to protect them against the danger."

Section 343A(1) of the Restatement adds:

> "A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness."

The problem with Schaefer's premises liability claim is that it is not really based on any dangerous condition on the land. When the alleged dangerous condition is some kind of tool, piece of equipment, or work practice, Illinois courts have repeatedly declined to analyze the claim under a premises liability theory. *See Gregory v. Beazer E.*, 384 Ill. App. 3d 178, 191, 892 N.E.2d 563, 577 (2008) (asbestos laden gloves and blanket did not give rise to premises liability); *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051, 1057, 728 N.E.2d 726, 731 (2000) (unsafe practice of manually hoisting sheet metal did not give rise to premises liability claim); *Quinton v. Kuffer*, 221 Ill. App. 3d 466, 472, 582 N.E.2d 296, 300 (1991) (exploding 55 gallon drum not a condition on the land) ; *Haberer v. Vill. of Sauget*, 158 Ill. App.

3d 313, 318, 511 N.E.2d 805, 808 (1987) (unsafe workplace practice of mixing grout manually without protective rubber gloves not a condition on the land). Thus Dynegy is entitled to summary judgment on the premises liability claim because the scaffolding in question was a piece of equipment and not a dangerous condition on the land.

### C.     Failure to Warn - Sections 388 of the Restatement (Second) of Torts

Defendant Dynegy is entitled to summary judgment on Schaefer's failure to warn theory of negligence. Illinois courts recognize a duty to warn under Section 388 of the Restatement. *Baylie v. Swift & Co.*, 27 Ill. App. 3d 1031, 1042, 327 N.E.2d 438, 447 (1975). Section 388 states:

> "One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> > (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
> >
> > (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
> >
> > (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

In sum, a duty to warn exists "where there is unequal knowledge, actual or constructive, and the defendant, possessed of such knowledge, knows or should know that harm might or could occur

if no warning is given." *Kirby v. Gen. Paving Co.*, 86 Ill. App. 2d 453, 457, 229 N.E.2d 777, 779 (1967).

Here, Schaefer fails to demonstrate that there was any unequal knowledge between himself and Dynegy. Schaefer acknowledged at his deposition that prior to the accident there was an issue with loose scaffolding. Schaefer recalled observing another Brand employee spray painting pieces of scaffolding with twisted ears to designate those pieces for removal. Wampler and Hudson also testified at their depositions that they were aware of problems with the scaffolding prior to Schaefer's injury. Schaefer's failure to warn claim fails as a matter of law because he was already aware of the problems associated with the scaffolding, and he has not demonstrated that there was any unequal knowledge between him and Dynegy.

### III.  CONCLUSION

For the foregoing reasons, Dynegy's motion for summary judgment is GRANTED for **Count IV** of the plaintiff's complaint.

**SO ORDERED.**

**DATED:**   **January 23, 2015** .

*s/Philip M. Frazier*
**PHILIP M. FRAZIER**
**UNITED STATES MAGISTRATE JUDGE**
